IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

      v.                                        24-cr-116

MATTHEW A. STEELE,

      Defendant.

_____

### MATTHEW STEELE'S SENTENCING MEMORANDUM

Matthew Steele, by and through counsel, respectfully submits the following sentencing memorandum in the above case.

The defense acknowledges the seriousness of the offense and the need for punishment, including a lengthy period of incarceration. For the reasons set forth below, and in accordance to the relevant factors the Court must take into account at sentencing, however, the defense respectfully requests that the term of incarceration imposed by the Court permit Matt to have a realistic chance of release from custody during his natural life.

### I.     Introduction

Matthew Steele is deeply sorry. He knows his actions were wrong. He understands his misconduct caused irreversible damage and pain to many people, particularly Victim 1. He regrets his decisions and his actions. He wants to atone for

what he did.  He knows there is nothing he can do to undo the damage and suffering he has caused.  He accepts the consequences imposed by the Court and he will do all he can to make things right.  In speaking with Matt, he concedes that his actions caused lasting and irreversible damage to people he cares about.

Matt never contested his guilt.  From the first time he was confronted by law enforcement, he acknowledged his misdeeds and expressed remorse.  Through counsel, he negotiated a plea agreement as quickly as possible given the constraints of federal criminal practice and the complexity of the law in this area.   While incarcerated he offered to give his home, his prized and most valued possession, to the primary victim.  When that was not feasible due to Department of Justice policy, he facilitated the sale of his home to provide compensation to his victim.

Matt knows his offense was reprehensible and worthy of punishment.  Before his arrest he dwelled on his misconduct and hoped for some way to make things right.  In accord to the plea agreement and the applicable sentencing guidelines, the Court will impose a lengthy period of incarceration that will doubtlessly encompass much of Matt's remaining natural life.

But, in analyzing the facts and circumstances of this case, the defense believes any resultant sentence should not be tantamount to a life sentence.  Matt's remorse, efforts at reform, and efforts to make things right should counsel the Court to impose a

sentence that gives Matt a chance at having meaningful living years out of federal custody.

## II.    Matthew Steele

Matt was born on April 30, 1971.  At the time of sentencing in this case he will be fifty-four years old.  He has never received any meaningful or sustained mental health treatment or emotional health therapy. If Matt would have had those services earlier in his life, counsel does not believe he would have engaged in the conduct at the center of this case or be standing before the Court awaiting sentencing.

Matt's biological parents, Harold and Sandy, were married when Matt was born. The second eldest of five children, Matt has little memory of his parents being married. They divorced when he was only six years old. Citing abuse from his father, his mother abruptly abandoned the family, apparently moving out of state, leaving Matt's father to manage the children on his own.  For decades Matt had no contact with his biological mother.   Matt's father, a collision shop owner, was ill-equipped at caring for five young children.  Family describes him as rigid and emotionally distant.  He worked long hours at his business, often leaving the house before 6 a.m. and returning after 9 p.m.

After Matt's mother left the family, Matt's father was plunged into fatherhood responsibilities he clearly did not anticipate.  Needing assistance in raising the children, Matt's father looked to his church and took in Christian missionaries to help offset the

3

costs of raising a family without a second parent.  Matt's father's decision to take in Christian missionaries introduced a revolving door of people into the family home, with each set taking on responsibilities in raising Matt and his siblings.  Matt recalls those years being chaotic and poorly structured.  They included inconsistent caregiving and a rotation of strange people living in the familial home.  Matt had no mother figure.

When Matt was ten years old, his father married Matt's stepmother Susan.  The family moved into Susan's home where she lived with her son, who was four years younger than Matt.  Harold and Susan went on to have one additional child, Matt's half- sister. Driven by Matt's father, the family was religious and strict.  His stepmother was controlling and rigid, administering physical and emotional punishment upon Matt.  Family members interviewed by Probation and counsel recall Matt being struck with physical objects and being forced to stand facing a wall for an extended period of time for seemingly small transgressions.   Family also recalled that Matt was labelled as a black sheep who seemed to receive more punishment and stricter punishment than other children in the family.  Family members interviewed by counsel agree that Matt was treated more harshly than the others.

Matt's home life was further complicated by his adoptive stepbrother, Johnny. Johnny was born with muscular dystrophy, a debilitating genetic disorder that results in the loss of motor function and muscle mass.  Throughout the duration of Johnny's life, Matt was a close companion and caretaker to his younger sibling.   As Johnny grew

4

older and the condition became more debilitating, Matt was increasingly put in the role of caretaker.  When his stepbrother could no longer walk or eat on his own, Matt was tasked with lifting and carrying his stepbrother, feeding his stepbrother, and assisting in helping his stepbrother do other basic functions, including bathing and going to the bathroom.  Matt loved his stepbrother and was dedicated to his family; however, Matt's dedication to making sure Johnny's needs were met meant that he was not able to leave the house freely to socialize with friends or to engage in other normal activities of a young adult.  As is often the case with individuals who suffer from muscular dystrophy, Johnny died when he was sixteen years old.

Until 9th grade Matt was sent to a strict religious school by his father.  When the family could no longer afford the tuition for the school, Matt was taken out of formal school and sent for homeschooling, which consisted of tutoring through the family's church.  When that program dissolved, Matt was sent to public school through the Iroquois Central School District.  Due to the unique nature of his educational path, and his lack of exposure to math and science in particular, he was placed in 9th grade when he started public school, even though he was the appropriate age to be 11th grade.  He spent all of high school in coursework with students two years younger than himself.

Despite those challenges, Matt completed high school in the Iroquois Central School District in 1991, also obtaining a certificate in Computer Aided Drawing. Following high school, he took a job at K&S Supply, Inc., in Lancaster, New York, a

5

local company that supplies construction materials.  Over the course of the next twenty-five years Matt thrived at K&S Supply.  Starting as a warehouse worker, Matt worked his way through the ranks of the company, becoming a yard worker, driver and, eventually, manager of the company.  He came to be known as the "right hand" of the Owner/President of the company, becoming a key employee entrusted with making important decisions.[1]  In 2017, however, the Owner/President retired, and new management was not comfortable with Matt's lack of a college degree.  As management changed policies and procedures that had been around for decades, Matt realized it was not the same company he had started working at nearly two decades prior.  He left that job in 2017.

Matt remained committed to gainful employment.  From 2017 until 2022, Matt was employed at a local plumbing company as an apprentice plumber.  He continued in that work until he found higher compensation working for Adams Nursery in Lancaster, New York in 2022.  He worked as a laborer for Adams Nursery until the time he was arrested in this case.  At all times, hard work was a hallmark of Matt's life.

---

[1] The former owner of the company continues to have a friendly relationship with Matt to this day, coming to visit Matt at the Orleans County Jail.

### III.    The Relationships That Shaped Matthew Steele

Matt Steele has been betrayed by every adult female he has ever had an important relationship with.  He has never had a healthy or supportive relationship with an adult woman.  His trust has been abused.  He has been misled and lied to.  The rug has been pulled out from under him.  Although the emotional toll Matt experienced in those relationships does not excuse Matt's misconduct in this case, in speaking with Matt, he does believe they offer insight into why he engaged in the misconduct at issue.

As was noted above, at age six Matt's biological mother abandoned the family, moving out of state and having no contact with Matt or his siblings for several years. While Matt and his mother did reconnect later in life, it is hard to overstate the impact that experience had on Matt.  Studies confirm, abandonment by the mother in early childhood leads to difficulty regulating emotions, poor impulse control, low self-confidence, and low level of enthusiasm.  It impairs all future relationships.  It is a traumatic experience that leaves a lasting impression on individuals, usually requiring therapy and other supportive structures to navigate adulthood.[2]  Matt did not receive any therapy or counseling after his mother left.

Instead, Matt experienced years of instability, where he was raised (in large part) by Christian missionaries who were physically present in his father's home but who

---

[2] See, e.g., https://cptsdfoundation.org/2021/02/25/the-long-term-effects-of-abandonment/

were there only for limited duration.  This experience was followed by his late childhood and early adult years being spent with his stepmother, a woman who, by all accounts, was physically and emotionally abusive toward Matt.  Without question, Matt never formed a maternal relationship with anyone.  He never had guidance or appropriate care from an adult woman.

Predictably, Matt's adult relationships went poorly.  He did not date throughout high school or his late teenage years, attributable to a constellation of familial and social factors set forth above.  His first serious girlfriend, Bridgett Kurnick, became his wife in 2004.  The relationship went badly and ended in divorce thirteen months later.  The catalyst for the divorce was Matt discovering that Bridgett had cheated on him through much of their courtship and all of their marriage.  As you would expect, that knowledge was devastating to Matt, who already struggled to form meaningful relationships and connections with women.

After the divorce, Matt had another long-term relationship with a woman his age.  The relationship was serious; the woman moved into Matt's home and the couple discussed marriage.  Once again, however, Matt learned his partner had been unfaithful to him and had also been taking advantage of him financially, stealing money from him and misrepresenting other financial information throughout the duration of their relationship.   The relationship ended.  Matt was devastated.

In at least four instances, Matthew Steele had had sustained relationships with adult women – women who he believed he could trust.  In each of the instances, the adult woman had let Matt down.  It was against that backdrop that the offense conduct occurred in this case.  Matt, seeking to connect with a person who (in his view) reciprocated the love he wanted to share, engaged in the offensive conduct that gave rise to this case.

## IV.    The Offense Conduct and Acceptance of Responsibility

Matt's wrongful acts are set forth in the Plea Agreement.  Matt does not ask that his conduct be excused or condoned.   He understands his actions are wrong and reprehensible.  There must be consequences, including a lengthy period of incarceration.  Matt looks forward to accepting the consequences imposed by the Court and doing what he can to make things right.  He does not contest his guilt.

Matt prepared a statement accepting responsibility for actions and expressing his desire that his sentence will bring healing and closure to the people he hurt.  **Exhibit 1**. In the statement, Matt wrote:

> I am sorry for what I did and for the pain that I caused.  I understand that my actions caused irreversible and lasting harm.   I am deeply sorry for what my actions did to my victim.  I would do anything to undo what I have done.
>
> I was raised in a very religious household.  I strayed from God.  I know my actions were wrong and inexcusable.  I did not follow the example set by my family, and I did not follow the example set in Church.  I sinned in a terrible way. I am so, so sorry for what I did.

Before I was arrested, for a long time I thought about the harm I had caused. I thought about its impact on my victim and on my relationship with God. I stayed awake at night and tried to think of a way to make things right. I wanted to do anything I could to make amends. Sometimes, I hoped I would get caught.

Now I have a new focus. I accept the consequences that will be imposed by the Court. I want to do whatever I can to atone for my sins and to make things right. I know there is nothing I can do to fully make up for the hurt that I have caused. I hope that my sentence brings healing and closure to everyone. I know it is a chance to make penance on Earth. I will use each day to do what I can to make things right.

Matt's statement is consistent with conversations with counsel. In the time counsel has represented Matt, Matt has often expressed his extreme regret at the harm he has caused. He understands that his actions irreversibly altered lives and caused immeasurable pain. He does not ask that his conduct be excused or condoned. Rather, accepts the punishment that will be imposed by the Court, hoping the consequences he experiences will act as penance for the misdeeds he committed earlier in life.

## V.     Matt's Life Post Arrest

Matt was arrested on March 11, 2024. He has been incarcerated at the Orleans County Jail since that time. As was noted in his statement to the Court, the thought of his misconduct and the harm that it caused haunted Matt for years. He has always been eager to make things right. And from the moment he was arrested, Matt has done all he can to make things right while incarcerated.

That is perhaps best evidenced in the way Matt has approached the disposition of his home, his primary asset and a source of pride throughout his life. By way of

10

background, Matt bought the home at 2160 Bullis Road in 2004. Home ownership was a major achievement for Matt. Over time he poured sweat equity into the property. The house and the property remain points of pride for Matt. It was an important part of Matt's identity.

Despite this, from his first conversation with counsel, Matt expressed his desire that the property be given to the victim, to dispose of as she saw fit, as an initial effort to make things right. Counsel reached out to the government to discuss this idea. At first, it appeared that was a possibility, and Matt hoped he could give the property to the victim directly. Ultimately, that was not permitted under Department of Justice protocols. Matt's efforts did result in the interim property sale agreement executed between the parties in this case, whereby Matt is selling his home with a recommendation from the prosecution that the proceeds be given to the victim.

While incarcerated, Matt has also focused on religion. He attends church regularly and consults with clergy whenever possible at the Orleans County Jail. He has long discussions and deep meditation on matters of sin, penance, atonement and forgiveness. Matt reads the scripture every day. Matt understands that he has sinned by any measure. He has embraced his sentencing and incarceration as a first step in atoning not only to his victims, but also to God.

While incarcerated Matt has also attended Uconnect, a jail program that connects inmates with counselors to focus on mental and emotional well-being. Matt sees a counselor one on one.  Matt reports that this experience has been the first time he has opened up to a professional and began to understand what factors led him to offend in this case.  Matt is confident that with continued mental health care he will grow as a person and not reoffend in the future.

Although he is incarcerated, Matt's work ethic remains.  Within the first few months of incarceration, he became a Trustee at the Orleans County Jail.  Trustees work a twelve-hour a day job for virtually no compensation.  The duties include assisting with preparation of meals, cleaning after meals, cleaning of the jail (including the public spaces in the jail), and other odd jobs as necessary. In his time as a Trustee, jail personnel have consistently noted Matt's hard work and positive attitude.  Matt believes it is important, even while incarcerated, to improve the world around him.  He believes that hard work is part of his penance.

Also noteworthy, in the two years Matt has been incarcerated, he has not received a single misbehavior report or other sanction for misconduct.  He has accomplished this feat despite the fact that for years inmates around him have been aware of the nature of Matt's offense and have intentionally made life difficult for Matt. Matt experiences verbal abuse and targeted attacks on a regular basis.  Hatred by those

around him is a daily reminder of what he has done and the condemnation from society he experiences. Consistent with his Christian teaching, Matt does not retaliate.

Finally, the support that Matt continues to receive from his family is also noteworthy. As the Court well knows, crimes like the one at issue in this case are of the type that are most scorned and condemned by our society. Despite that knowledge, Matt continues to receive support – a testament to the good in Matt that is beyond the wrongdoing in this case.

For instance, his older sister, Rebecca Procyshyn, took the time to write to the Court. In her letter, Ms. Procyshyn recalls the challenging household the family grew up in, noting that she ran away from home at age sixteen to escape the rigidness of the home. Ms. Procyshyn goes on to note Matt's caring nature and love for his family, recalling instances where he went out of his way to help her and others in their time of need. Perhaps most noteworthy, Ms. Procyshyn states that, even after all he has done, she still loves Matt and looks forward to a time when they can spend time together again.

Those sentiments are echoed by other letters attached from Matt's family and supporters. And those letters make an important point: despite the seriousness of Matt's offense, there is more to Matthew Steele than his offense.

## VI.    Relevant Sentencing Factors

As the Court knows, 18 U.S.C. 3553(a) requires a district court to impose a sentence that is "sufficient, but not greater than necessary," to achieve the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). "The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009); *Gall v. United States*, 552 U.S. 38, 48-50 (2007). "The sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, explaining any variance from the former with reference to the latter." *Nelson*, 555 U.S. at 351.

When determining the appropriate sentence, the court must consider six different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the United States Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among similar defendants found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a).

The Court's discretion to give such weight to these factors as it deems just is broad, and it may consider any fact that it deems relevant to sentencing. *See, e.g.,United States v. Greene,* 249 F.Supp 2d 262 (S.D.N.Y. 2003) (defendant who had pled guilty to tax charges and faced incarceration in accord the Federal Sentencing Guidelines was sentenced to three years of probation because of his civic and public service, the health needs of his family, and the nature of the charges.); *United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (affirming downward variance based on judge's own "sense of what is fair and just" and defendant's "education, emotional condition, favorable employment record, family support, and good record on state probation"); *United States v. Ortiz*, 213 F. App'x 312, 317 (5th Cir. 2007) (holding that the district court properly considered, among other factors, defendant's lack of criminal history, family responsibilities with aging parents and children in his care, services in the armed forces and his stable work history); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Empirical evidence from the United States Sentencing Commission supports the conclusion that sentencing courts often view the guideline range for child pornography related offenses as being too harsh.  For instance, throughout the country in the 2024 calendar year, 43.1% of sentences for child pornography were under the guidelines set

15

in the Guidelines Manual.  Likewise, the average sentence for individuals convicted

of trafficking child pornography was 151 months.  Of those sentenced nationally, 11.5%

had a prior sexual abuse or child pornography conviction and were subject to a 15-year

mandatory minimum penalty; their average sentence was 257 months, still below the

average guideline range. Of that group, 53.2% were downward variances.  In the same

group, the average sentence reduction resulted in a sentence that was 36.7% lower than

the calculated guideline range.[3]

Review of other cases supports the same conclusion.  For instance, in *United

States v. Puglisi*, 458 Fed. Appx. 51 (2d Cir. 2012), the defendant, a former teacher, was

convicted at trial of attempted production and production of child pornography,

persuading, inducing, and enticing a minor to engage in sexual conduct, and attempted

possession and possession of child pornography.  The defendant manipulated a victim

into engaging in sex acts and in making video/photographic depictions of sex acts, both

on her own and with him.  After trial, the applicable Guideline Range was calculated as

235-293 months of incarceration.  At sentencing, the district court imposed a sentence of

180 months of incarceration.  On appeal, the sentence imposed was affirmed.

That was also apparent in the recent Second Circuit opinion in *United States v.

Varbel,* 2025 U.S. App. LEXIS 8987 (2d Cir. 2025).  Varbel, who was in his forties, posed

---

[3] Child Pornography | United States Sentencing Commission

as a teenage boy online to manipulate underage girls into sending him sexual images. Varbel and a co-conspirator then coerced the victims into sending more explicit material by threatening to disseminate the images to the victims' friends and family. Varbel engaged in hundreds of separate conversations with minors worldwide and possessed over 2,700 sexually explicit videos of underage victims. After his guilty plea, the Guidelines contemplated over 400 months of incarceration. The sentencing court imposed a sentence of 300 months, far below the guideline range, and that sentence was affirmed by Second Circuit on appeal.

### a. History and Characteristics of the Defendant

Matt understands that the nature of his offense must be the primary focus of the Court's analysis at the time of sentencing. But, Matthew Steele – and indeed, Matthew Steele's life – is far more than the offense of conviction.

Matt has no criminal history. Indeed, this case marks his first contact with the legal system of any kind. He has never been arrested or incarcerated before. He is also a dedicated son, brother and friend who, by all reports, has been a supportive and loving presence in the lives of his family. That is reflected in his time taking care of his half-brother Johnny who had muscular dystrophy; it is also echoed in the letters attached to this memorandum by Matt's family members. Matt is also an otherwise

17

responsible citizen.  He worked hard at honorable employment from the time he was old enough to work until the time he was arrested.

In considering this factor, the defense also believes the Court should consider Matt's extreme remorse for his misconduct, as is evidenced by his willingness to give his home his to the victim and in his actions in working to facilitate the sale of the property while incarcerated.   Courts have consistently found that extreme remorse, and acts evidencing extreme remorse, "warrant some reduction of what would otherwise be the reasonable advisory guideline range." *Bienvenido v. United States*, 2011 U.S. Dist. LEXIS 30101, at 5 (S.D.N.Y. Mar. 21, 2011); *see also United States v. Johnson*, 245 F. Supp. 3d 393 (E.D.N.Y. 2017) (noting the defendant's expression of extreme remorse in imposing a sentence that would forego further prison time and allow the defendant to be immediately deported).

In the same vein, "evidence of postconviction rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011).  Matt's ability to make matters right while incarcerated at the Orleans County Jail have been limited.  In trying to provide his house to the primary victim and his efforts to reconnect with his religion demonstrate postconviction efforts at rehabilitation that the defense believes will continue when Matt enters the Bureau of Prisons and is afforded access to more tailored and appropriate rehabilitative programming.   In conversations with counsel, Matt knows that he needs more

18

supportive services, especially sex-offender specific therapy.  He embraces receiving that therapy for the first time through his incarceration.

### b.  Just Punishment

18 U.S.C. 3553 directs the Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of federal criminal sentencing.  Courts have considered a number of factors in determining whether a particular sentence is "just."  In this regard, Matt concedes his offense was serious and warrants serious punishment.  He has never contested his guilt or advocated for a disposition that did not include substantial incarceration.  He understands and accepts the fact that he will be incarcerated for a very long time.

But, child pornography offenses have some of the harshest Guidelines of any offense in the federal courthouse.   As was referenced earlier, the harshness of the Guidelines have been recognized by courts and judges across the country. *See, e.g., United States v. Pulsifer*, 469 Fed. App'x 41, 44 (2d Cir. 2012) (describing the "unusually harsh impact of the child pornography Guidelines"); *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) (expressing the "view that the sentencing guidelines [for child pornography] are in our judgment harsher than necessary"); *United States v. Henderson*, 649 F.3d 955, 964 (9th Cir. 2011) (Berzon, J., concurring) (describing the "unjust and sometimes bizarre results" that follow from application of the child

pornography Guidelines). Consistent with that fact, the empirical data set forth above confirms that, for the most recent calendar year, most child pornography sentences were below the Guideline range.

### c. Deterrence

The Guidelines require district courts to consider the need for their sentences to afford adequate deterrence to criminal conduct. 18 U.S.C.S. § 3553(a)(2)(B). This requirement in turn requires courts to factor in the need for a sentence to provide adequate general deterrent value. The § 3553(a) factors expressly provide for consideration of general deterrence. General deterrence, defined as a goal of criminal law generally, or of a specific conviction and sentence, to discourage people from committing crimes, is about preventing criminal behavior by the population at large and, therefore, incorporates some consideration of persons beyond the defendant. *United States v. Davis*, 82 F.4th 190, 193 (2d Cir. 2023).

The defense believes the relevant deterrent value can be achieved with any sentence at or above the mandatory minimum and any corresponding period of supervised release. Such a sentence is significant, and it would mean that Matt would be incarcerated until his mid-seventies. Any such sentence will also be paired with significant financial consequences, including the loss of Matt's home, as well as a lifetime of supervised release mandating close, tailored oversight by Probation. Those

20

consequences will have significant deterrent value for the population at large, sufficient to deter others from engaging in similar offenses.

### d. Protection of the Public

Protection of the public is an important goal of federal sentencing. As the Court knows, if the Court were to impose the statutory minimum penalty in this case, Matt would be in his mid-seventies at the time he is released – well beyond the age that males are sexually active/interested. As the Court also knows, at any point that Matt is released from federal custody, he will be closely monitored and supervised by Probation, subject to mandatory sexual offender terms and conditions of his release. Finally, the prosecution and conviction of Matt has garnered media attention and has had a ripple effect throughout his family and social circle; everyone who comes into contact with Matt is aware of the nature and circumstances of his offense.

Simply put, given the facts and circumstances of this case, the defense believes that a sentence at the statutory minimum will suffice to protect the public.

### e. Rehabilitation

Because of Matt's offense of conviction, the defense believes the Bureau of Prisons will designate him to a facility with sex offender treatment. Any post-incarceration release will continue that treatment. Stated another way, a sentence at the mandatory minimum will link Matt with significant, tailored and intense therapy and

21

oversight that will doubtlessly continue for the duration of his natural life. As a result, the defense believes the goal of rehabilitation will be met by any sentence imposed by the Court and by Matt's following through on the treatment and therapy mandated by the Bureau of Prisons and Probation.

## VII.    Restitution

In entering into that plea, Matt understood that, pursuant to 18 U.S.C. § 2259, the Court must order restitution for an amount no less than $3,000 per victim. He does not dispute that statutory calculation. He hopes payment of restitution – whenever he is financially able to make it – will help atone for his wrongdoing.

Matt also wants to do what he can to make things right with regard to his victims. As stated earlier, that was why he facilitated the sale of his home to provide financial compensation to his victim. Consistent with the terms of Matt's agreement with the government, the prosecution will recommend that the proceeds of that sale be given to his victim.

As the Court also knows, in relevant part, the restitution statute states that "the court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. 2259(B). Prior to the passage of the statute, but in language that remains a touchstone of the calculation of restitution, the Second Circuit held that the victim's

losses must be proximately caused by the defendant's offense.  *United States v. Aumais*, 656 F.3d 147 (2d Cir. 2011).  While the current statute no longer embraces proximate cause as the sole legal concept driving the restitution award, the cases continue to access the proximity of the defendant to the wrong experienced by the victim, characterizing this as an assessment as analysis of the defendant's "relative role in the causal process." *United States v. Jones*, 815 F. App'x 870, 883 (6th Cir. 2020).

As part of the plea agreement, Matt concedes he possessed child pornography of other victims.  He concedes possession of this material was wrong.  He acknowledges that possession of the material creates a market for the victimization of others, which causes widespread harm through our society.

In analyzing this issue, however, the defense is mindful of the fact that, with regard to other victims, Matt's involvement was passive and did not proximately cause the victimization.  Stated another way, while Matt's conduct is blameworthy, it has a low relative role in the causal process.  Accordingly, with regard to other victims, the defense believes Matt's restitution amount should be set at or near the $3,000 figure, consistent with the statute and case law.

## VIII.   Conclusion

From his first contact with law enforcement, Matthew Steele acknowledged his wrongdoing and expressed his desire to atone for his sins.  Since that time, he has done all that he can to make matters right.  He facilitated the sale of his house.  He has embraced his relationship with religion.  He has engaged in counseling.  He looks forward to accepting the consequences imposed by this Court.  And he prays that his punishment will bring peace and closure to the people he has hurt.

DATED:      December 16, 2025               ___*s/ Eric M. Soehnlein*
                                            Eric M. Soehnlein, Esq.
                                            Attorney for Matthew Steele
                                            SOEHNLEIN LAW PLLC
                                            135 Delaware Ave., Ste 406
                                            Buffalo, New York 14202
                                            eric@soehnleinlaw.com